IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RICKY R. MCCOURT,

         Plaintiff,

v.                                       Civil Action No. 2:05-CV-45

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

         Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY
## AND REQUEST THAT
## CLAIMANT'S COUNSEL SET FORTH ONLY ONE ARGUMENT UNDER EACH
## ASSIGNMENT OF ERROR

## I.  Introduction

A.    <u>Background</u>

      Plaintiff, Ricky R. McCourt, (Claimant), filed his Complaint on May 24, 2005, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on July 28, 2005.[2]  Claimant

filed his Motion for Summary Judgment and Memorandum in Support on August 26, 2005.[3]

Commissioner filed her Motion for Summary Judgment and Brief in Support on October 24, 2005.[4]

B.    <u>The Pleadings</u>

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 9.

[4] Docket No. 12.

1. <u>Claimant's Motion for Summary Judgment and Memorandum in Support</u>.

2. <u>Commissioner's Motion for Summary Judgment and Brief in Support</u>.

C.   <u>Recommendation</u>

1.   I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision.  Specifically, the ALJ (1) properly evaluated and weighed the opinion of Claimant's treating psychiatrist;   (2) properly evaluated Claimant's credibility; and (3) posed a proper hypothetical question to the Vocational Expert.

2.   Claimant's counsel is requested to set forth only one argument under each assignment of error.

## II.  Facts

A.   <u>Procedural History</u>

 On April 1, 1999, Claimant filed for Disability Insurance Benefits (DIB) alleging disability since March 22, 1999.  The application was denied  initially and on reconsideration.  A request for hearing was timely filed.  An unfavorable Administrative Law Judge decision was issued on August 17, 2000.  Claimant filed a timely request for review by the Appeals Council.  The Appeals Council remanded the case to the Administrative Law Judge on July 5, 2002 for further resolution.  A hearing was held on March 11, 2003 before an ALJ.  The ALJ's decision, dated July 7, 2003, denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on April 12, 2005.  This action was filed and proceeded as set forth above.

B.   <u>Personal History</u>

Claimant was 35 years old on the date of the March 11, 2003 hearing before the ALJ. Claimant has a high school education and past relevant work experience as a general laborer and a lumber sorter.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: March 22, 1999–April 12, 2005.

**Bone and Joint Surgeons, Inc., 3/25/99, Tr. 298:**
Diagnosis: Mechanical back pain.

**Physical Residual Functional Capacity Assessment, 4/26/99, Tr. 309-316**
Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., sit 6 of 8 hours, unlimited push and pull.

Postural limitations: None established.

Manipulative limitations: None established.

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations: extreme cold (avoid exposure); extreme heat, wetness, humidity, noise, vibration, fumes, odors, hazards (unlimited).

**Morgan D. Morgan, M.A., 7/29/99, Tr. 217-321**
Diagnostic Impression:
Axis I:              Adjustment disorder, with depressed mood.
Axis II:      Learning disorder and otherwise specified.
Axis III:      Reported back pain and limb numbness due to past muscle strain and vertebra
              fracture, right ear hearing loss, and right eye vision loss.


**Frank D. Roman, Ed.D., 8/9/99, Tr. 322-330**

Medical disposition: impairment(s), not severe.
Categories: organic mental disorders, affective disorders.

Organic mental disorder: LD.

Schizophrenic, paranoid and other psychotic disorder: no evidence.
Affective disorders: disturbance of mood, accompanied by a full or partial manic or depressive syndrome by adjustment disorder.
Mental retardation and autism: no evidence.
Anxiety related disorders: no evidence.
Somatoform disorders: no evidence.
Personality disorders: no evidence.
Substance addiction disorders: absent

"B" Criteria of the Listing.
SLIGHT: restriction of activities of daily living; difficulties in maintaining social functioning.
SELDOM: deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner.
NEVER: episodes of deterioration or decompensation in work or work-like settings.

**Dr. Arturo Sabio, M.D., 8/30/99, Tr. 331-339**
Impressions:
1.      Chronic back strain.
2.      Status-post fracture of the transverse processes of the lumbar spine.
3.      Moderated obesity.
4.      Amblyopia.

**Physical Residual Functional Capacity Assessment, 9/10/99, Tr. 340-346**
Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., sit 6 of 8 hours, unlimited push and pull.

Postural limitations: None established.

Manipulative limitations: None established.

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations: None established.

**Dr. Kenneth D'Amato, 12/29/99-11/23/99, Tr. 348-349**
Grade II sprain of the lateral collateral ligament.

**Psychological Evaluation, 2/17/00, Tr. 350-354**
Diagnostic Impression:
Axis I:                 Pain disorder; mood disorder due to 724.2 with major depressive like
                        episode; anxiety disorder due to 724.2, with generalized anxiety..
Axis II:        Deferred

4

Axis III:      History of 724.2, back, kidney, lung, and bladder problems.
Axis IV:      Medical problems. unemployed, low income.
Axis V:       Current GAF 55.

## Psychiatric Review Technique, 2/25/00, Tr. 355-363

Organic mental disorders
>    Psychological or behavioral abnormalities: memory impairment; disturbance of mood; emotional liability and impairment in impulse control.

Schizophrenic, paranoid and other psychotic disorders
>    Psychotic features and deterioration that are persistent: emotional withdrawal and/or isolation.

Affective Disorders
>    Disturbance of mood: depressive syndrome (sleep disturbance, psychomotor agitation or retardation, difficulty concentrating or thinking).

Mental Retardation and Autism: no evidence.

Anxiety-Related Disorders
>    Generalized persistent anxiety (motor tension, apprehensive expectation, vigilance and scanning).

Somatoform Disorders
>    1.    History of multiple physical symptoms of several years duration.
>    2.    Unrealistic expectation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury.
>    3.    Pain.

Personality Disorders
>    Inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress:     persistent disturbances of mood or affect.

Substance Addiction Disorders: absent

"B" Criteria of the Listing
>    Marked:      restriction of activities of daily living, difficulties in maintaining social functioning;

>    Moderate:      difficulties in maintaining concentration, persistence, or pace;

>    Repeated episodes of decompensation:      one or two;

**Residual Functional Capacity Assessment. 2/25/00, Tr. 364-368**

NOT SIGNIFICANTLY LIMITED: the ability to remember locations and work-like procedures; the ability to make simple work-related decisions; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to change in the work setting; the ability to be aware of normal hazards and take appropriate precautions; the ability to set realistic goals or make plans independently.

MODERATELY LIMITED: the ability to understand and remember short, simple instructions; the ability to understand and remember detailed instructions; carry out short, simple instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to set realistic goals or make plans independently of others.

MARKEDLY LIMITED: the ability to carry out detailed instructions; the ability to perform activities within a schedule, maintain regular attendance; the ability to complete a normal workweek without interruptions form psychologically based symptoms and to perform at a consistent pace; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

**Medical Assessment of Ability to do Work-Related Activities, 2/25/00, Tr. 368-369**

Occupational Adjustments:
1.     Follow work rules, good.
2.     Relate to co-workers, fair.
3.     Deal with the public, good.
4.     Use judgment, good.
5.     Deal with work stresses, poor.
6.     Function independently, poor.
7.     Maintain attention/concentration, fair.

Making performance adjustments:
1.     Understand, remember and carry out complex job instructions, fair.
2.     Understand, remember and carry out detailed, but not complex job instructions, fair.
3.     Understand, remember and carry out simple job instructions, good.

Making Personal/social adjustments:
1.     Maintain personal appearance, good.
2.     Behave in an emotionally stable manner, fair.
3.     Demonstrate reliability, good.

**Bone & Joint Surgeons, 9/27/00-3/19/00, Tr. 370-371**

Radiographs of his back are normal.

Diagnosis: mechanical back pain.

**Dr. Kenneth D'Amato, 3/3/00, Tr. 372, 386**
Soft tissue swelling ever the anterior talofibular ligament; range of motion is good; pain with inversion but not instability.

**DVR, Beta III and WRAT III Testing, 3/23/00, Tr. 373-374**
Beta IQ: 106.

**Webster County Memorial Hospital, 3/3/00, Tr. 375-384**
Impression: soft tissue swelling; negative for current fracture.

**Bone & Joint Surgeons, Inc., 2/17/00-3/20/00, Tr. 402-403**
Mechanical back problem.

**Summersville Memorial Hospital, MRI of the Lumbar Spine, 6/3/00, Tr. 405**
Impression: unremarkable MRI of the lumbar spine without evidence for disc herniation or spinal canal stenosis.

**Summersville Memorial Hospital, X-ray of the Lumbar Spine, 6/3/00, Tr. 406**
Vertebral body height and disc spaces are maintained.  Minimal spurring.  Mild to moderate facet arthrosis and hypertrophy, lowest two levels.

D.      Testimonial Evidence

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 756-808, 818-863):

Okay.  So tell me why you're not able to work at the present time as we sit here today.  Tell me what you think is the most serious problem and how it affects your ability to work.

A       I'm very uncomfortable.

Q       Okay.  What's the - - do you have a - - what makes you uncomfortable?  Your back?

A       Yes.

Q       Okay.  And where do you get pain in the back?

A       My hip area, lumbar and right underneath my shoulder blade, mainly on the right side.

Q       Okay.  And you had a work accident.  Is that right?

A       Yes.

Q       And when did you have that accident?

A       July '95.

Q       Okay.  Now, you mean you - - as you sit here today, you look like you're uncomfortable and you're moving around.  Is this the way that you've been since you had that accident in July of '95?

A       Actually, it's been getting worse.

Q       Okay.

A       The pain's become more frequent.

                        *                *                *

Q       All right.  Well, do you have any problem just sitting as you're doing here today?

A       Yes.

Q       How long can you sit for?

A       I don't know.

Q       Okay.

A       I just know I just ain't very comfortable.

                        *                *                *

A       I usually only eat about one meal a day anymore.   I don't know.  I just usually - - I'll go outside for a little while, go up and talk to the neighbor, walk back to the house.

*             *             *

A Actually, I'd rather lay down, but, yeah, I'll go ahead and stand up.

Q Okay.  Now, you're holding your right arm kind of into your side.  Why are you doing that?

A I don't know.  I've just had numbness in my right side of my body lately, and it just - - I mean its moveable, but it just - - at times, it just - -

Q And that's the side of your body that you hurt when you had your fall?

A Yeah, it's just like I got tingling in it, like pins and needles at times.

Q Where do you have the tingling in your arm or - -

A Huh?

Q Where do you have the tingling?

A Just more or less, all the way down it.

*             *             *

Q Do you go grocery shopping?

A No.

Q Why not?

A I don't like - - I can't walk around the stores.

Q Why?  What bothers you?

A My back starts hurting from walking around.

Q Where does it start hurting you?

A Usually, around the hip area down next to the tailbone.

Q How about the - - you go out and play with your daughters, play games with

them?

A    Not like I want to.

Q    Well, tell me what you can do.

A    Usually, I don't do much at all anymore. I mean every now and then, I'll be feeling pretty good, and I'll take them to the playground or something. Usually, I sit over and watch them and let them play.

*          *          *

Q    Why are you walking with the limp?

A    I just don't like no weight on my right leg. It just hurts in my hip area.

Q    Now, you had a sprained ankle not too long ago. Is that right?

A    Yes, in November.

Q    Does that have anything to do with your limp?

A    No.

Q    So you feel like that - -

A    I  was doing this way before I ever sprained my ankle.

Q    So you feel like the limping or at least the ankle is pretty well cleared up by now?

A    Yes.

ATTY     Okay.

ALJ      How did you sprain your ankle?

CLMT     I stepped on another guy's foot. Well, actually, he kind of took my feet up from under me.

*          *          *

10

Q	Okay. You seem that you were irritable witness, that you - - it made you irritable if we were asking you questions. Is - - does that happen to you at home or is that just today?

A	That happens all the time.

Q	Does your family irritate you like that?

A	Sometimes, to be honest.

Q	Do you feel like you need to get away by yourself and not be with them?

A	I like being with my family, but at times, I feel like I need - - I just - - at times, they make me feel like I can't - -

A	Most of the time I spend around the house, most of the time in bed because I hate sitting around too long. It just kills me. I'm dying right now.

Q	What do you mean you hate sitting around?

A	My back starts hurting and aching so bad I can't stand it, and it's hurting pretty bad right now. And usually, I go lay on the heating pad. It's like lying there for awhile and then it's like I get tired of laying. I'll get up, pace through the house or I'll just sit in my recliner, watch birds out the window. That was one thing the doctor told me to do is find a hobby where I can do something like that.

\*	\*	\*

Q	Why? What bothers you about the walking?

A	My back starts hurting. My leg - - I can't stand with the weight on my right leg. It hurts too bad. I can't handle weight on my right leg. I'm supposed to have a scoping on my right knee and just don't have the money to have it done.

\*	\*	\*

A       Well, right at the moment, yeah, but they - - went into have it done and I had an anxiety attack on the doctors, and  - -

Q       So what happens when you have an anxiety attack?

A       My heart starts racing, shallow breathing, my temper goes extreme.  I can't concentrate.  I get dizzy.

*                    *                    *

Q       So you may be driving down the road and have to pull over, and it might be a half hour before you get [INAUDIBLE]?

A       Yeah.

Q       And how frequently do you have those - -

A       Weekly.

Q       - - anxiety - -

A       I don't know.  Sometimes I have them two or three times a week, sometimes less.  And the doctor told me there a couple weeks ago I was on the verge of a heart attack.  I was having them almost daily.

Q       What, the anxiety attacks you mean?

A       Yeah.

Q       And which doctor told you that?

A       Debbie Blake [phonetic].

Q       It's because you have increased heart rate?

A       High blood pressure, high cholesterol, and all that, I guess.  I don't know exactly what all - - I know she had me in for a bunch of tests right before she told me that, and that's

when she put me on the diet.

*          *          *

Q      Now, the  - - now, you're presently - - do you have other problems besides your problems with your anxiety attacks which you think keep you from working?

A      My back pain.

Q      Okay.  Is it in your low back?

A      Yeah.

*          *          *

Q      Ever have any problems walking through the store?

A      I have collapsed before.  I have been taken to the hospital from the store before because where I had - - where I collapsed because of the pain.

Q      What happened to you?

A      It just - - I had the - - the little boy just kind of grabbed a hold of my arm and jerked on me, and the pain just shot through me, and I just blacked out from the pain is what they said because it just - - he grabbed my whole arm and jerked me around a little bit, and twisted me.  I was in the - - had to go to the hospital for that.  And one other time, they - - that happened at Food Land, but it's not Food Land now.  It's a [INAUDIBLE].  And then, another time, I had it happen - - a similar thing happened to me in G & R.  The store clerks helped me out to my vehicle.  I didn't go to the hospital.

*          *          *

A      Anything I pick up or anything with the right hand just seems to pull through my back all through down my shoulder.

13

*      *      *

A      I have trouble putting on my shoes and socks, and my pants sometimes.

Q      What bothers you about doing those activities?

A      Bending over trying to do it.  My wife has to help me in and out of the shower lots of times because I got to step over the edge of the tub, and it's - - I can't put no weight on my right leg, and you come over it, and you have to come over quick.  And - -

Q      Why can't you put any weight on your right leg?

A      It just puts a lot of pressure up in my lower hip, and it hurts.  I've got numbness in my right leg.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr.808-817, 863-871):

Q      Okay.   I want you to assume a hypothetical individual with the same age, education and background as the Claimant, and with a residual functional capacity for light work, but with the further restriction that the Claimant would have to be able to change positions every half hour.  In other words, if he's walking, he'd have to - - or walking or standing, he'd have to sit down for a few minutes.   Would there be jobs that such a person could do?

A      Yes, there would be.  They would include hand packer, 380 regionally, 85,000 nationally, assembler, 980 regionally, 148,000 nationally or cashier, 660 regionally, 30,000 nationally.

Q      I'm going to give you a further RFC at a sedentary, but again, with the requirement that he be able to change position, in other words, move from a sitting position to

14

being able to stand up for a few minutes at a time. Would there be jobs that such a person could do?

A       Yes, hand packer would still exist, 270 regionally, 40,000 nationally, telephone solicitor, 1,350 regionally, 131,000 nationally or ticket sales, 1,700 regionally, 171,000 nationally.

                    *                    *                    *

ALJ       All right. I'm going to ask you a further hypothetical then. If the Claimant had a sedentary residual functional capacity, but would have to lay down two hours during a work day, would there be any jobs that he could perform?

VE       No, there would not be.

ALJ       Okay.

ATTY       Counsel, you have any other questions?

ATTY       Yes, sir, just real quick here. Let me get his diagnosis here.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       The first thing I wanted to ask you is whether or not his literacy level would have any impact on these jobs you've identified? He apparently has a learning disability and he's right on the borderline between marginal and limited with reading at about the 7th grade level, spelling is between four and six, and arithmetic - - it says high school. I'm not sure what that means. Do you know what they - -

A       I have no idea.

Q       Could that be 9th grade or are they talking - -

A       Well, the jobs are suggested - - if he has reading difficulties, I would not suggest

telephone solicitor job.  There are, however, other jobs I could replace that with.  In terms of the ticket sales job, he has to be able to make change, and basically, that's really reading it off the cash register, so I would think that even a 9th grade education would allow him to do that.

Q        Well, that would be okay.

A        Yes.

Q        All right.  Do you have DOT numbers for these jobs that you've identified for us?

A        I have census code numbers.

Q        Okay.

A        The only way I could get numbers was through the census code.  Hand packer is 888.  The assembler is 785.  Hold on a second.  Ticket sales is 276.  I don't know what else I gave, so you're going to - -

Q        Hand packer.

A        Hand packer is 888.

Q        And then, cashier.

A        Cashier 276.

ALJ        When you say census codes, you - - is that part of the DOT number or - - okay.

VE        Let me explain.

ALJ        Okay.

VE        The government releases figures now.  They group jobs that have similar - -

ALJ        Characteristics.

16

VE              - - characteristics with the same exertional level and the same training level, SVP.

ALJ         Okay.

VE            So there might be a plastics assembler, a wood assembler, and that's called a census code.

ALJ         Okay.

BY ATTORNEY:

Q       Where do you get the worker characteristics?

A       From the DOT.

Q       From the DOT.  So you - -

A       I don't get them.  The - -

Q       They do.

A       Yes, the Department of Labor does.

Q       In the Department of Labor, are they described with each category, the worker characteristics in the census code?

A       No, there is a cross reference book - -

Q       Okay.

A       - - which you would go to and that gives you those things.

Q       Okay.  But - - okay.  I understand.  Thank you.

A       Okay.  Sure.

ATTY       Okay.  Now, this gentleman apparently has an overlay of - - a psychological overlay to his physical pain.  And according to - - Judge, I don't have the exhibit

numbers, but they are the assessments that accompany the Batiste Stewart [phonetic] evaluation that was just recently submitted.

ALJ  Okay.

ATTY  And I want you to assume that 67 - - let's see - - 67 percent of the time or more - -

VE  Okay.

ATTY  - - this person is going to have difficulty carrying out detailed instructions, performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances, completing a normal work day and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest period, and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and I think behavioral extremes could cover the tearfulness such as was exhibited today. And I'm wondering what impact that cluster of assumptions would have on these jobs that you've identified.

VE  That cluster would preclude him from any work.

*  *  *

Q  With respect to Claimant's past relevant work, jobs that he's had in the last 15 years of working at long enough to learn how to do the job, and its substantial gainful activity level, could you identify the jobs as to how they would be characterized in the <u>Dictionary of Occupational Titles</u>, and skill level and exertional level?

A  The lumber sorter job, medium and unskilled, and he had four years of loading and unloading trucks, which is heavy to very heavy and unskilled.

Q      And so the lumber you said was medium and a truck - -

A      Was heavy to very heavy.

Q      Okay.  I want you to - - let's see here.  I want you to assume a hypothetical individual the same age, education and work experience as the Claimant.  He has the ability to do light work, wouldn't be able to do any jobs that would require a complex - - involving any complex detailed instructions, would be able - - wouldn't be able to do any jobs that would require high rates of production such as assembly line work or jobs such as telemarketing where you have to meet a - - telemarketing sales where you have to meet sales quota [INAUDIBLE] continuing basis.  Would there be any unskilled jobs that such a hypothetical person could do in the local or national economy?

A      Yes, Your Honor, the hypothetical individual could function as a laundry folder, light, 50,000 nationally, 650 regionally.  And the region is West Virginia, Eastern Ohio, Western Pennsylvania and Western Maryland.  Or ticket taker, light, 190,000 nationally, 1,700 regionally.

Q      I'm going to ask you another hypothetical.  I want you to assume the hypothetical individual would have the ability to do medium work with the same limitations.  Would there be any  similar type jobs at the medium level?

A      Laundry worker, medium, 375,000 nationally, 1,800 regionally, kitchen attendant, medium, 950,000 nationally, 6,200 regionally.

Q      And I want you to assume a hypothetical person the same age, education and work experience as the Claimant, would have the ability to do light work, but would have to stand or walk for six hours, but couldn't do standing or walking for more than about 20 minutes at a time, and then would have to rest for a few minutes, could sit for six hours in an eight hour

day, would have to, you know, change positions about every hour, be limited [INAUDIBLE] as I previously indicated. Would there be any unskilled jobs such a hypothetical person could do in the local or national economy?

A   The two that I gave you would stand, Your Honor.

ALJ   I'm going to ask you another hypothetical at the sedentary level. We have - - Dr. Erich's RFC basically doesn't really show any limitations.

ATTY   Until you look at the last page of the PRT.

ALJ   The what?

ATTY   The last page of her PRT. She has comments on there.

ALJ   Well, I got - - I see comments on page four.

ATTY   Let me look at that. She indicated - - well, that was kind of confusing to me, but she did not find very many limitations. I think there were only a couple in the moderate range, but then she said in conclusion, that she didn't think he could work full-time, and that even at home, he was having trouble tolerating stress.

ALJ   All right. I'm looking [INAUDIBLE].

ATTY   Let me see if I can put my finger on it.

ALJ   Okay. It says person has alleged inability to work since this period under consideration stands from that [INAUDIBLE]. You feel that the impairments which have been identified probably exist at the current level of severity.

ATTY   It looks like its on page 13 of the PRT.

ALJ   I'm looking at the functional - - mental functional capacity.

ATTY   So this would be going backwards to - - well, page 13 of that form

20

[INAUDIBLE].

ALJ  Okay.  Now I have it.  So that's also filled out by her?

ATTY  She did both at the same time.  Okay.  Next - - I'll look faster.

ALJ  Okay.

ATTY  [INAUDIBLE].  Is that page 13?

ALJ  Yeah.

ATTY  [INAUDIBLE].

ALJ  Yeah.

ATTY  No, that's the PRT.

ALJ  Yeah, that's a PRT.  Okay.  Well, I'm going to ask this question.  I want you to assume a hypothetical individual the same age, education and work experience as the Claimant that would have the ability to do sedentary work [INAUDIBLE], would not be able - - wouldn't be able to maintain regular attendance and - - on a regular ongoing basis, wouldn't be able to demonstrate - - wouldn't be reliable, and would not relate predictably in social situations in the workplace without exhibiting behavioral extremes to the extent that these limitations would cause the Claimant to absent from work or unable to do his job at least half of the time. Would there be any unskilled jobs that such a hypothetical person could do in the local or national economy?

VE  That would eliminate work, Your Honor.

ALJ  Okay.  I basically went to Mr. Gorgi's [phonetic] functional capacity statement.

ATTY  Could I make a concluding remark?

ALJ          Yeah.

ATTY         Oh, wait, I looked at all of the different assessments in the file and, of course, psychologist Morgan was the consultant for DDS and he did not fill out an assessment. Dr. Roman filled out the assessment.  I think that was the earliest one in the record, and it was 10F and 11F and they found no severe impairment.  On the other hand, Batiste [phonetic], in 15F, Clausdale [phonetic], in 46F, and Erich, the one we just looked at - -

ALJ          Um-hum.

ATTY         - - and Goody [phonetic], all four of those found significant limitation of tolerating stress. Batiste said poor.  Clausal said moderate.  Erich says moderate defined as one-third to one-half of the work day, and Goody said moderate to marked.  So from one-third to one-half of the work day, I think would be a conservative estimate - -

ALJ          All right.

ATTY         - - to tolerate stress level.

E.      Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life.

•      Was playing basket ball, 1/6/01.  (Tr. 450).

•      Drives (post office, his doctor, church).  (Tr. 764, 825, 839).

•      Socializes with his neighbor.  (Tr. 780).

•      Sometimes takes his sister to work.  (Tr. 781).

•      Attends a computer class once a week.  (Tr. 782).

- Able to pick up a gallon of milk with his left hand.  (Tr.  785, 853).

- Goes to church every Sunday and sometimes Wednesday.  (Tr. 793).

- Takes two (2) steps to get into his house.  (Tr. 824).

- Hobby: bird-watching; football cards.  (Tr. 837, 854).

- Tries to walk almost every evening for exercise.  (Tr. 841).

- Can walk for a half hour.

- Sometimes goes grocery shopping.  (Tr. 848).

- Sometimes plays games on his daughter's computer.  (Tr. 852).

- Reads the Bible and inspirational stories.  (Tr. 854, 855).

- Can sit for an hour in his recliner.  (Tr. 855).

- Can sit for two hours while watching the birds.  (Tr. 855).

- Sometimes goes fishing.  (Tr. 856).

### III.  The Motions for Summary Judgment

A.  <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) by failing to properly evaluate and weigh the opinion of Claimant's treating psychiatrist;  (2) by  failing to properly evaluate Claimant's credibility, specifically Step One of the credibility analysis; and (3) by relying upon an incomplete and inadequate hypothetical question to the Vocational Expert and by failing to include Claimant's mental limitations in the RFC.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ (1) properly evaluated and weighed the opinion

of Claimant's treating psychiatrist; (2) properly evaluated Claimant's credibility; and (3) formulated a proper hypothetical question to the VE.

B.    The Standards.

1.    Summary Judgment.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).    The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.    Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.    The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.    42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of

24

Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.    Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine:

1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

1.  THE ALJ FAILED TO PROPERLY EVALUATE AND WEIGH THE OPINION OF
CLAIMANT'S TREATING PSYCHIATRIST.

Claimant maintains that the ALJ erred by failing to mention the opinion of Dr. Urick, Claimant's treating psychiatrist, that "Mr. McCourt's emotional difficulties would interfere with his ability to participate in full-time work [R. 567]" and "The patient continues to have difficulty handling even minor stresses in his own home-stresses of even an ordinary level would be expected to be difficult for him to tolerate." Pl.'s Br. at 7. Commissioner counters that the ALJ properly evaluated Dr. Urick's opinion.

Although the ALJ is required to indicate the weight given to all relevant evidence, Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit does not require that the ALJ discuss every piece of evidence.[5] It has been repeatedly recognized that the ALJ's "duty of

_____

[5]  The Undersigned notes that the Seventh Circuit has held that a written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence. See Green v. Shalala, 51 F.3d 96, 101 (7th Cir.1995). Also, the Eighth Circuit has held that the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it. Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998). See also, Walker v. Secretary of Health and Human Services, 884 F.2d 241, 245 (6th Cir.1989)(reviewing court many examine all the evidence, even if it has not been cited in the

explanation is not intended to be a mandate for administrative verbosity or pedantry.  If a reviewing court can discern 'what the ALJ did and why he did it,' the duty of explanation is satisfied."  <u>Piney Mountain Coal Co. v. Mays</u>, 176 F.3d 753, 762 n. 10 (4th Cir. 1999) (citing <u>Lane Hollow Coal Co. v. Director, OWCP</u>, 137 F.3d 799, 804-805 (4th Cir. 1998)).  Therefore, this Court must examine the record to determine whether there is substantial evidence for the ALJ's decision.

The opinion of Claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence.  <u>Evans v. Heckler</u>, 734 F.2d 1012, 1015 (4th Cir. 1984).  Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2).  <u>See</u> <u>Craig</u>, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

While the credibility of the opinions of the treating physician is entitled to great weight, it will be disregarded if there is persuasive contradictory evidence.  <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984).  To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3);

---

Secretary's decision).

Heckler v. Campbell, 461 U.S. 458, 461 (1983); 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1. (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

In reviewing the decision of the ALJ, the Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id. Weighing conflicting evidence from medical experts is exactly what the ALJ is required to do. See Books v. Chater, 91 F3d 972, 979 (7th Cir. 1996)(pointing out that when assessing conflicting medical evidence from medical experts, an ALJ must decide, based on several considerations, which doctor to believe).

All medical opinions are to be considered in determining the disability status of a claimants. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is

"disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Social Security Ruling (SSR) 96-5p at *3.

The Court's review of the record reveals that the ALJ undertook such an analysis here, reasonably resolved all such conflicts, and that the record more than adequately bears out his conclusions. In this case, the ALJ reviewed the entire medical record before him (Tr. 31) and found that giving Dr. Uric's opinion the controlling weight would have been inappropriate under the regulations. Specifically, the ALJ stated:

> The undersigned Administrative Law Judge has considered the opinion of the claimant's treating physician Urick. Dr. Urick completed a Psychiatric Review Technique form (Exhibit 50F) which is used by Social Security Administration decision makers in determining if someone meets or equals a Listing but completed it with definitions added by attorney for the claimant. Thus, under the attorney's definition, any slight or moderate limitation would meet any Listing. Also, medical source statements provided by the claimant's attorney with definitions supplied by the claimant's attorney indicate only a moderate problem in this area. The undersigned does not give the opinion controlling weight because there is other evidence in the medical evidence of record contra, including consultative evaluation and State Agency physician opinions. (Tr. 50-51).

For example, Dr. Clausell, who evaluated Claimant, opined that Claimant had no restriction in his ability to understand and remember and carry-out short instructions. (Tr. 537). Dr. Clausell noted that Claimant had a slight restriction in his ability to make judgments on simple work-related decision and moderated restrictions in his ability to understand, remember, and carry-out detailed instructions. (Tr. 537). It was also noted that Claimant had slight restrictions in his ability to respond appropriately to work pressures and to changes in routine work settings (Tr.

538).  The ALJ further stated that he gave more weight to Dr. Clausell's opinion than to the opinion of psychologist Goudy "because the consultative evaluation was performed by a medical doctor and Dr. Goudy is a psychologist" who never performed a clinical evaluations with Claimant present.  (Tr. 51).  Additionally, Mr. Roman, a psychologist with the state agency, who evaluated the medical evidence regarding Claimant's depression, reported that Claimant had sight restriction of activities of daily living, slight difficulties maintaining social functioning; seldom had difficulties in maintaining concentration, persistence and pace, and no episodes of decompression.  (Tr. 329).

As was stated above, because the Court will not re-weigh or reappraise the evidence, the ALJ was free to find facts concerning Claimant's impairments.  The ALJ's findings were based on the ALJ's comprehensive review of the objective evidence, functional assessment of consulting and treating physicians and Claimant's account of his daily activities.  Thus, because the ALJ is not required to discuss every piece of evidence and because there is substantial evidence in the record to support the ALJ's findings, the ALJ properly weighed Dr. Urick's opinion and was not required to cite the specific portions of Dr. Urick's opinion.

Claimant further contends that the ALJ failed to recontact Dr. Urick regarding the definitions utilized on the forms.

20 C.F.R. § 404.1512(e) provides in pertinent part:

> (e) Recontacting medical sources.  When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we need additional information to reach a determination or a decision.  To obtain the information, we will take the following actions.
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily

available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques....

SSR 96-5p provides in relevant part:

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Claimant states that "[i]f the [ALJ] had questions regarding the role the definitions played in [Dr. Urick's] opinion, [the ALJ] was required by SSR 96-5p to recontact Dr. Urick for clarification." Pl.'s Br. at 10. However, the regulations only require the Commissioner to recontact a treating physician when "the evidence we receive from your treating physician...is inadequate for us to determine whether you are disabled." 20 C.F.R. § 404.1512(e). In the present case, Claimant submitted evidence from multiple treating and examining physicians. Contrary to Claimant's argument, the ALJ found Dr. Urick's assessment inconsistent with the other evidence of record, and not "inadequate." See 20 C.F.R. § 404.1512(e). Moreover, the extensive medical records in this case clearly provide an adequate basis for the Commissioner's findings. Therefore, the ALJ was not required to recontact Dr. Urick.

Finally, Claimant argues that the ALJ failed to properly analyze the opinions of Dr. Steward and Dr. Battisti. The ALJ noted, however, that the psychologists' conclusions were based on Claimant's subjective complaints. (Tr. 49). Claimant's statements alone are not enough to establish that there is a physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a); Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). The ALJ's findings were based on the ALJ's

comprehensive review of the objective evidence. As was stated above, the Court will not re-weigh or reappraise the evidence. The Court finds that the ALJ properly analyzed the opinions of Dr. Steward and Dr. Battisti.

### 2. THE ALJ FAILED TO PROPERLY EVALUATE CLAIMANT'S CREDIBILITY, SPECIFICALLY STEP ONE OF THE ANALYSIS.

Claimant asserts that the ALJ erred in determining his credibility, specifically Step One of the analysis. Commissioner counters that the ALJ properly determined Claimant's credibility.

Unfortunately for Claimant, his argument is without merit. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). The ALJ must apply a two-step analysis when assessing the credibility of a claimant's subjective complaints of pain. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

In this case, the ALJ correctly applied the Craig test. The ALJ found that "[t]he claimant's chronic back strain, degenerative joint disease of the right knee, hypertension, obesity, pain disorder, mood disorder, and anxiety disorder could reasonably be expected to produce some

of the pain and symptoms alleged by the claimant." (Tr. 48). This satisfies the first prong of Craig.[6]

The ALJ then considered Claimant's subjective complaints of debilitating symptoms in light of the entire record in accordance with the second prong of Craig. The ALJ was in the best position to observe Claimant at the hearing and evaluate his credibility. The ALJ noted that Claimant's subjective complaints were not fully credible because they were contradicted in the medical records. (Tr. 47). For example, the ALJ noted that several treating medical sources had expressed doubt as to reliability of Claimant's subjective complaints. (Tr. 49). For example, Dr. Lilly reported "evidence of symptom amplification magnification at this time." (Tr. 529). Dr. Lilly also reported Waddell signs[7] present during straight leg distraction, regional weakness, sensory disturbance, over reaction to the exam and simulation of loading and rotation. (Tr. 529). Dr. Lilly also noted that a sensory examination of the lower extremity was "amplified and nonphysiologic." (Tr. 529). Dr. Lilly diagnosed amplified pain behavior. (Tr. 530). Additionally, Dr. Steward noted that Claimant's scores on the MMPI could not be considered valid because of the high "F" score and low "K" score. (Tr. 352).

The ALJ also considered Claimant's treatment history, use of medications and daily

---

[6] The Court agrees with the Commissioner that remanding this case for the sole purpose of allowing the ALJ to revise his statement at step one is not appropriate. See Pittman v. Massanari, 141 F. Supp.2d 601 (W.D.N.C. 2001); Glass v. Shalala, 43 F.3d 1392 (10th Cir. 1994); Boyd v. Barnhart, No. Civ.A.1:04 CV 00078, 2005 WL 555584 (W.D.Va. March 09, 2005). See also Ward v. Commissioner of Social Security, 211 F.3d 652, 656 (1st Cir. 2000) ("While an error of law by the ALJ may necessitate a remand, remand is not essential if it will amount to no more than an empty exercise.")

[7] A Waddell's sign indicated inappropriate behavior in a patient with a complaint of back pain.

activities. (Tr. 48-49). Having considered all the evidence in accordance with the second prong of Craig, the ALJ is in the best position to determine Claimant's credibility. Although the ALJ determined that Claimant had medically demonstrable severe impairments, the ALJ also determined that Claimant's testimony was not fully credible and inconsistent with his medical record. (Tr.53). Accordingly, the standards set in Craig have been met, and the ALJ did not err in evaluating Claimant's credibility.

### 3. THE ALJ RELIED UPON AN INCOMPLETE AND INADEQUATE HYPOTHETICAL QUESTION TO THE VOCATIONAL EXPERT AND FAILED TO INCLUDE CLAIMANT'S MENTAL LIMITATIONS IN THE RFC.

Finally, Claimant alleges that the ALJ should have included additional limitations in the hypothetical question to the vocational expert. The Commissioner counters that the limitations included in the hypothetical question to the vocational expert are supported by the record.

The question is whether the hypothetical question properly set forth all the relevant evidence of record concerning Claimant's impairments. The Fourth Circuit Court of Appeal has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record. Russell v. Barnhart, No. 02-1201, 2003 WL 257494, at ** 4 (4th Cir. Feb. 7, 2003). The court further stated that the hypothetical question may omit non-severe impairments, but must included those that the ALJ finds to be severe. Id. Moreover, based on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ. France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

The ALJ's hypothetical to the vocational expert incorporated Claimant's limitations that are supported by the record.[8]  The ALJ presented a hypothetical individual who was limited to light work with the following limitations: low stress work that requires no complex or detailed instructions, no high rates of production, such as assembly line work, and no jobs requiring an individual to meet sales quotas.  (Tr. 50).   In response to the ALJ's proper question, the VE testified that the hypothetical individual could perform light work, such as laundry folder and ticket taker.  (Tr. 52).  Accordingly, the ALJ properly included all of Claimant's impairments supported by the evidence of record in posing the hypothetical question to the vocational expert.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision.  Specifically, the ALJ (1) properly evaluated and weighed the opinion of Claimant's treating psychiatrist;  (2) properly evaluated Claimant's credibility; and (3) posed a proper hypothetical question to the Vocational Expert.

Claimant's counsel is requested to set forth only one argument under each assignment of error.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be

---

[8]  As was already discussed, the ALJ properly evaluated the opinions of Dr. Urick, Dr. Battisti, Dr. Steward and Dr. Goudy.

submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: May 1, 2006

/s/ James E. Seibert_____
JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE